UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CITY OF MOUNT VERNON and CITY OF :
MOUNT VERNON URBAN RENEWAL :
AGENCY, :
                Plaintiffs, :
                 :
v. : Copy mailed by Chambers 3-26-19 DH
                 :
ERNEST D. DAVIS, as Mayor of City of Mount : **OPINION AND ORDER**
Vernon; ERNEST D. DAVIS, as an Individual; :
MAUREEN WALKER, as Comptroller of the : 18 CV 3007 (VB)
City of Mount Vernon; MAUREEN WALKER, :
as an Individual; JAIME MARTINEZ, as :
Planning Commissioner and Executive Director :
of the Mount Vernon Urban Renewal Agency; :
JAIME MARTINEZ, as an Individual, :
MARCUS GRIFFITH, as Councilman of the :
City of Mount Vernon; MARCUS GRIFFITH, :
as an individual; ANDRE WALLACE, as :
Councilman for the City of Mount Vernon; :
ANDRE WALLACE, as an Individual; :
ROBERT KELLY, as City of Mount Vernon :
Police Commissioner; ROBERT KELLY, as an :
Individual; ATLANTIC DEVELOPMENT :
GROUP, LLC; PETER FINE; BLUE RIO, LLC, :
(a New York Corporation); BLUE RIO :
KENWOOD, LLC; BLUE RIO, LLC (a :
Connecticut Corporation); TITUS MOUNT :
VERNON, LLC; JOHN SARACENO; and :
JOHN DOE #1 TO JOHN DOE #10 :
                Defendants. :
-----------------------------------------------------------------x

Briccetti, J.:

       Plaintiffs City of Mount Vernon (the "City") and City of Mount Vernon Urban Renewal

Agency (the "URA") bring this action against Ernest D. Davis; Maureen Walker; Jaime

Martinez; Marcus Griffith; Andre Wallace; Robert Kelly; Atlantic Development Group, LLC;

Peter Fine; Blue Rio, LLC (a New York Corporation) ("Blue Rio NY"); Blue Rio Kenwood,

LLC; Blue Rio, LLC (a Connecticut Corporation) ("Blue Rio CT"); Titus Mount Vernon, LLC;

1

John Saraceno; and John Does Nos. 1 to 10, alleging a violation of the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030 et seq., as well as several state law claims.

Now pending are motions to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) from (i) Davis, Walker, Griffith, and Wallace (collectively, the "City defendants") (Docs. ##54, 57, 60, 61); (ii) Titus Mount Vernon, LLC, and Saraceno (collectively, the "Titus defendants") (Doc. #84); (iii) Atlantic Development Group, LLC, Blue Rio NY, Blue Rio CT, Blue Rio Kenwood, LLC, and Fine (collectively, the "Atlantic defendants") (Doc. #108); (iv) Martinez (Doc. #115); and (v) Kelly (Doc. #80).[1] Kelly, proceeding pro se, also moves to impose sanctions. (Doc. #107).

For the reasons set forth below, the motions are GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

In deciding the pending motions, the Court accepts as true all well-pleaded factual allegations in the amended complaint and draws all reasonable inferences in plaintiffs' favor, as set forth below.

I.  The URA's Compliance Issues with Federally Funded Loans for Affordable Housing

Several of plaintiffs' allegations concern federally funded loans for affordable housing. According to the amended complaint, the City receives funds from the United States Department

---

[1] On June 15, 2018, plaintiffs filed an amended complaint. On June 18, 2018, Kelly filed this motion to dismiss. (Doc. #80). On August 2, 2018, Kelly requested the opportunity to file an answer to the amended complaint (Doc. #121), and on August 6, 2018, Kelly filed an answer to the amended complaint (Doc. #124). After reviewing Kelly's various submissions, the Court construes Kelly's motion to dismiss as his operative response to the amended complaint. The Court disregards Kelly's August 6, 2018, submission, which is improperly framed as an untimely motion to dismiss as well as an answer.

of Housing and Urban Development ("HUD") under two programs: the Community Development Block Grant ("CDBG") program and the Home Investment Partnership ("HOME") program. Using these funds, the URA issues loans to developers to support the creation or redevelopment of affordable housing within the City.

On January 1, 2016, Richard Thomas took office as the City's mayor, replacing Davis. About a month into his term, Mayor Thomas allegedly became aware of "significant issues with the administration, accounting, and compliance of the URA." (Am. Compl. ¶ 154). Specifically, Mayor Thomas learned that internal audits of the URA demonstrated "egregious oversights and mishandling of funds by the previous administration," including a $6 million discrepancy in funds. (Id. ¶¶ 156, 160). According to these audits, the URA failed to comply with federal regulations and had entered into agreements with "unconscionably low interest rates on significant loans with no payments, not even interest payments, due until the maturity of the loan." (Id. ¶ 158). These discoveries were supported by a 2015 HUD report which questioned the URA's management of funds under the HOME program. It found URA personnel did not have the "knowledge to ensure compliance," and that the agreements with developers were not fully compliant with federal regulations. (Id. ¶¶ 141–42).

Plaintiffs claim Martinez, then executive director of the URA and the City's planning commissioner, had actively concealed these compliance issues. (Am. Compl. ¶ 155). Allegedly, Davis, the former mayor, and Walker, the comptroller, knew or should have known about these problems. (Id. ¶¶ 163–64).

II. February 26, 2016, Incident and Police Response

According to plaintiffs, on February 26, 2016, Mayor Thomas terminated Martinez, who was then escorted from city hall by two police officers. Because Martinez's office contained

3

sensitive and confidential documents that concerned federal and state funds, Mayor Thomas told Martinez that he could collect his personal items after his office was inventoried the next day. Despite this warning, Martinez attempted to take a computer, but the officers stopped him. The office was locked and secured.

At 9:00 p.m. that night, Richard Gerken, the city hall night watchman, allegedly saw two men in Martinez's office, and alerted a police detective. The men were later identified as city councilmen Wallace and Griffith. In Gerken's statement to police, he said he observed Griffith "making a pile of paperwork, plaques, and other stuff he placed into bags." (Am. Compl. Ex. P at 1). Despite their position as councilmen, plaintiffs allege Wallace and Griffith did not have any authority to be in the secured planning commissioner's office, especially not after business hours. On orders from the mayor, Gerken told Wallace and Griffith to leave the building.

According to the amended complaint, Wallace and Griffith took the bags to city hall's back parking lot, where Martinez was waiting in a vehicle. Police arrived and questioned the men, and the men were eventually released on orders from Police Commissioner Kelly. (Am. Compl. ¶¶ 190–91). Griffith, Wallace, and Martinez left city hall with the bags, and as of the filing of plaintiffs' amended complaint, Griffith, Wallace, and Martinez have not returned the items taken that night.

The officers filed a police report, which did not note Martinez's presence at city hall. (Am. Compl. Ex. Q). The report was allegedly altered four times in the next four days. According to plaintiffs, Commissioner Kelly ordered a lieutenant "to request the deletion of all but 1 of the electronic and paper police reports." (Id. ¶ 221). Further, plaintiffs claim Kelly "admitted to Mayor Thomas that he had altered official documents and acknowledged that it was wrong for him to do so." (Id. ¶ 228). Kelly was terminated as police commissioner.

III.     The City's Investigation

According to the amended complaint, Mayor Thomas commenced an investigation into the disbursement of the HOME and CDBG loans. The investigation revealed the URA "consistently failed to comply with or even respond to various HUD orders and directives[,] or to comply with the terms of federal loan and grant agreements." (Am. Compl. ¶ 231). The investigation uncovered "substantial egregious deficiencies" in the compliance with the CDBG and HOME programs. (Id. ¶ 232).

In addition to enforcement deficiencies, the investigation uncovered $6 million in, what plaintiffs allege were, "suspect loan transactions," or federally funded loans that were either (i) not properly documented, (ii) potentially uncollectable, (iii) not compliant with federal guidelines, or (iv) de facto grants. (Am. Compl. ¶¶ 233–34). Many of the original documents concerning these loans were allegedly missing.

IV.     The URA's HOME and CDBG Loans

Plaintiffs allege these suspect loan transactions involved loans to the Titus defendants and the Atlantic defendants. Plaintiffs point to three loans specifically:

HOME Loan to Titus: On July 1, 2010, the URA and Titus entered into an agreement for a HOME loan to develop affordable housing for low-income families at a property located at 60 West First Street in Mount Vernon. (Doc. #85-3 at 1–2).[2] The URA loaned $800,000 to Titus, and the loan was secured by the property at 60 West First Street. Under the agreement's terms, interest would be "computed on the outstanding unpaid principal amount of the advances during the construction period at five percent (5%) per annum, payable on the first day of each month

---

[2]     The Court considers this loan agreement to be a document incorporated by reference in the amended complaint. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

5

commencing with the first calendar month following the advance." (Am. Compl. ¶ 60). Plaintiffs allege the first interest payment was due on December 1, 2010, but no payment was made.

The URA made an additional disbursement of $200,000, in March and September 2012. Plaintiffs allege no documentation regarding these disbursements were filed with the Westchester County Clerk, and no payments have been made on this additional disbursement.

CDBG Loan to Atlantic and Blue Rio CT: On October 13, 2013, the URA and Atlantic Development Group entered into an agreement for a $1.65 million loan under the CDBG program to build 159 units of affordable housing in the City. (Am. Compl. Ex. E). The parties agreed that 1% interest per annum would accrue from the date the funds were advanced, with payments to start in the month immediately following the first advance. (Id. at 6). On December 20, 2013, Atlantic received the $1.65 million as specified in the agreement. Plaintiffs allege payments have not been made per the terms of the agreement.

In November 2014, the CDBG loan was amended. Atlantic assigned the loan to Blue Rio CT, and the URA and Blue Rio CT amended the loan's repayment terms. Under the amended agreement, the interest continued to accrue at 1% per annum, but no payments would be due until Blue Rio CT paid "the full payment of the deferred developer fee." (Am. Compl. Ex. K at 1; see also id. ¶ 116). The "deferred developer fee" is not defined in the agreement or the underlying paperwork. (Id. ¶ 121). Plaintiffs also allege the URA board did not approve this amendment. (Id. ¶ 119). The parties executed an amended note on November 13, 2014. Plaintiffs allege payments have not been made per the terms of the amended agreement.

HOME Loan to Blue Rio CT: On November 13, 2014, the URA and Blue Rio CT entered into an agreement for a $1.48 million loan under the HOME program for 11 affordable

6

housing units within Atlantic's larger 159-unit project. The terms mirrored the terms of the amended 2014 CDBG loan with the interest accruing at 1% per annum, and no payments due until Blue Rio CT paid "the full payment of the deferred developer fee." (Am. Compl. Ex. H at 4). Plaintiffs allege payments have not been made per the terms of the agreement.

## DISCUSSION

I.  Standard of Review

   A.  Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). A cause of action "is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it," Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). Even if no party raises a jurisdictional challenge, federal courts have an independent obligation to determine whether subject matter jurisdiction exists even when no party challenges it. See Joseph v. Leavitt, 465 F.3d 87, 89 (2d Cir. 2006). The party invoking the Court's jurisdiction bears the burden of establishing that jurisdiction exists. Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

When deciding whether subject matter jurisdiction exists at the pleading stage, the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d at 143. "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atl. Mut. Ins. Co.

v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992) (citing Norton v. Larney, 266 U.S. 511, 515 (1925)).

B.  Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the U.S. Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, a complaint's allegations must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

II.  Standing and Capacity to Sue

The City defendants, as well as Martinez and Kelly, argue the Court should dismiss plaintiffs' amended complaint, because plaintiffs' lack standing and the capacity to bring this suit.

The Court disagrees.

As a preliminary matter, while the City defendants, Martinez, and Kelly lump together their arguments on standing and capacity to sue, those concepts are different, and the differences are consequential.

Standing refers to the constitutional requirement that a party suing in federal court have suffered an "injury in fact" that is causally connected to the conduct complained of and capable of being redressed by a favorable judgment from the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). Here, plaintiffs have alleged they suffered an injury causally connected to defendants' actions that is capable of redress. Beyond boilerplate citations to the definition of standing, defendants make no attempt to explain why they believe plaintiffs lack standing, and therefore, their arguments fail.

Capacity, on the other hand, is "a party's personal right to come into court" and "is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined without regard to the particular claim or defense being asserted." 6A Charles Wright et al., Fed. Prac. & Proc. § 1559 (3d ed. 2016). Unlike standing, a plaintiff does not need to plead capacity to sue in its complaint. Fed. R. Civ. P. 9(a)(1)(A) (no requirement to plead capacity); cf. Amidax Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011) (noting plaintiffs must "allege facts that affirmatively and plausibly suggest that it has standing").

Contesting capacity creates an issue of fact, see Wright, supra, § 1294, and a complaint is only properly dismissed for failure to state a claim if a plaintiff's lack of capacity is apparent on the face of the complaint. Manhattan Review LLC v. Yun, 2016 WL 6330474, at *3 (S.D.N.Y. Aug. 15, 2016), report and recommendation adopted, 2016 WL 6330409 (S.D.N.Y. Oct. 26,

9

2016);³ see also Klebanow v. N.Y. Produce Exch., 344 F.2d 294, 296 n.1 (2d Cir. 1965) (noting that lack of capacity may be raised in Rule 12(b)(6) motion "when the defect appears upon the face of the complaint").

The question of whether plaintiffs have capacity to bring their claims cannot be resolved at this stage of the litigation. Defendants claim a majority vote by the City's Board of Estimate and Contract authorizing this suit should have occurred but did not. (See, e.g., Doc. #133 at 3–4). That is an evidentiary consideration, and therefore, improper for the Court to consider on a motion to dismiss.

Accordingly, defendants' challenges to plaintiffs' capacity are premature.

III.    Computer Fraud and Abuse Act

The CFAA, 18 U.S.C. § 1030 et seq., in pertinent part, punishes an individual who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." 18 U.S.C. § 1030(a)(4). Initially enacted as a criminal statute to address the "then-novel problem of [computer] hacking," Hancock v. Cty. of Rensselaer, 882 F.3d 58, 63 (2d Cir. 2018), it has since been amended to permit a civil cause of action. 18 U.S.C. § 1030(g); see also Fischkoff v. Iovance Biotherapeutics, Inc., 339 F. Supp. 3d 408, 417–18 (S.D.N.Y. 2018).

To be timely, a civil suit under the CFAA must be filed "within 2 years of the date of the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). Damage means "any impairment to the integrity or availability of data, a program, a system, or information." Id. § 1030(e)(8). Put differently, "the limitations period begins to run when the

---

³       Because defendant Kelly is proceeding pro se, he will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

plaintiff discovers that, or has information that would motivate a reasonable person to investigate whether, someone has intentionally accessed the 'facility through which an electronic communication service is provided' and thereby obtained unauthorized access to a stored electronic communication." Sewell v. Bernardin, 795 F.3d 337, 340 (2d Cir. 2015).

    A.    Timeliness

Martinez and Kelly argue plaintiffs' CFAA claim is time-barred.

The Court disagrees.

When defendants raise timeliness in a pre-answer motion to dismiss, their affirmative defense may be granted only if it is clear on the face of the complaint that the statute of limitations has run. Guo v. IBM 401(k) Plus Plan, 95 F. Supp. 3d 512, 520 (S.D.N.Y. 2015).

Plaintiffs filed this action on April 5, 2018; therefore, their CFAA claim is timely unless on or before April 4, 2016, plaintiffs discovered or had information that would motivate a reasonable person to investigate whether a protected computer had been improperly accessed. At this early stage of litigation, drawing all reasonable inferences in plaintiffs' favor, there is no indication on the face of the amended complaint that plaintiffs possessed this disqualifying information on or before April 4, 2016.

While plaintiffs allegedly knew Martinez had concealed damaging audits, resulting in his termination on February 26, 2016, and two councilmen took materials out of Martinez's office, there is no indication on the face of the amended complaint that plaintiffs knew on or before April 4, 2016, that the computer in Martinez's office had been accessed. The City's internal investigation ultimately revealed that several electronic files from Martinez's computer were

missing, but plaintiffs do not allege when that occurred. Therefore, the Court cannot find it is clear on the face of the complaint that the statute of limitations has run.[4]

Accordingly, at this stage of the litigation, plaintiffs' allegations are enough to allow this claim to proceed to discovery. However, if evidence later demonstrates plaintiffs' action is untimely, the Court will revisit this question.

### B. CFAA Claim Against Griffith, Wallace, and Martinez

Martinez argues plaintiffs do not sufficiently allege damage or loss in excess of $5,000, as required by the CFAA. See 18 U.S.C. § 1030(c)(4)(A)(i)(I).

The Court disagrees.

In their amended complaint, plaintiffs allege "[t]he removal of the files, electronic computer data, and property from the sealed URA office has damaged Plaintiffs up to Six Million Dollars ($6,000,000.00)." (Am. Compl. ¶ 257). Plaintiffs have thus alleged damages in excess of the statutory minimum of $5,000. At this stage, that is all that is required.

For their part, the City defendants argue plaintiffs' allegations that Griffith and Wallace violated the CFAA are "entirely false," because they did not remove official documents on February 26, 2016. (Doc. #62 at 11–12). Whether plaintiffs' allegations are false is not an appropriate argument on a motion to dismiss when the Court must assume the truth of plaintiffs' well-pleaded factual allegations and draw all reasonable inferences in plaintiffs' favor. See Ashcroft v. Iqbal, 556 U.S. at 679.

---

[4] That said, the Court is dubious of plaintiffs' argument that they only had information warranting an investigation upon Kelly's termination on April 9, 2016, when plaintiffs discovered Kelly "improperly amended the [police] incident report numerous times and ultimately inhibited the investigation." (Doc. #128 at 19). The Court sees no reason why Kelly's alleged mishandling of police reports would have any effect on plaintiffs' impetus to investigate, especially when plaintiffs had begun investigating these loans in early February 2016 and their own internal investigation ultimately revealed that many original files had been removed from the office. (Am. Comp. ¶ 235).

12

Plaintiffs' CFAA claim against Martinez, Griffith, and Wallace may proceed.

C.   CFAA Claim Against Kelly

Kelly argues plaintiffs have failed plausibly to allege that Kelly violated the CFAA. The Court agrees.

Plaintiffs allege Kelly violated the CFAA when he ordered the alteration or deletion of police reports concerning the February 26, 2016, incident from a protected computer. (Am. Compl. ¶ 268). Plaintiffs claim Kelly's alteration or attempted deletion of the electronic police files exceeded Kelly's authority as police commissioner. (Id.). Plaintiffs do not, however, allege facts suggesting why Kelly, as the police commissioner, did not have the authority to issue such an order concerning an internal incident report. Plaintiffs merely allege Kelly "admitted . . . that he had altered official documents and acknowledged that it was wrong for him to do so." (Id. ¶ 228). This unadorned allegation reveals nothing about Kelly's <u>authority</u> to access internal documents and what was "wrong" with any action or attempted action. Therefore, plaintiffs fail plausibly to allege Kelly accessed a protected computer without authorization or exceeded his authorized access.

Accordingly, plaintiffs' CFAA claim against Kelly is dismissed.

IV.   State Law Claims

Asking the Court to exercise supplemental jurisdiction, plaintiffs also bring state law claims of negligence, conversion, breach of contract, and unjust enrichment against all defendants concerning the terms and repayment of certain HOME and CDBG loans. Plaintiffs also bring a negligence claim against Kelly concerning the police department's investigation of the February 26, 2016, incident.

With the exception of the negligence claim against Kelly, the Court finds it lacks subject matter jurisdiction over plaintiffs' state law claims.

Under 28 U.S.C. § 1367(a), district courts "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." The federal and state law claims "must stem from the same 'common nucleus of operative fact;' in other words, they must be such that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'" Montefiore Med. Ctr. v. Teamsters Local 272, 642 F.3d 321, 332 (2d Cir. 2011) (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966)). Within the Second Circuit, supplemental jurisdiction requires more than a "loose factual connection" between a federal and state law claim; the facts underlying the claims must "substantially overlap[]." LaChapelle v. Torres, 37 F. Supp. 3d 672, 680–82 (S.D.N.Y. 2014) (finding no supplemental jurisdiction for a state law breach of contract claim when there was no allegation it was related to a federal trademark infringement claim); see also Bu v. Benenson, 181 F. Supp. 2d 247, 254 (S.D.N.Y. 2001) (claims were not "part of the same case or controversy" where state law claims "involve[d] different rights, different interests, and different underlying facts" than the federal law claims). "[C]ourts have held that there is no common nucleus of operative fact where the events underlying the federal claims occur at a different time than the events underlying the state law claims." Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d 381, 394 (E.D.N.Y. 2007).

Here, plaintiffs' federal and state law claims do not arise from the same common nucleus of operative fact, and therefore the Court lacks supplemental jurisdiction over plaintiffs' state law claims. Plaintiffs' state law claims involve the contractual terms of complex federally funded loans that the URA issued to developers for affordable housing in 2013 and 2014.

14

Plaintiffs' federal claim involves a single instance of alleged computer fraud in 2016. Not only did the federal and state law claims occur at different times, they "involve different rights, different interests, and different underlying facts." Bu v. Benenson, 181 F. Supp. 2d at 254. For instance, to prove their state law claims of negligence, conversion, breach of contract, and unjust enrichment, plaintiffs would need to introduce evidence about the terms of the loans, whether these terms diverged from customary CDBG and HOME program loans, and whether the Atlantic defendants and the Titus defendants breached these terms by failing to make interest payments. To prevail on the federal claim, plaintiffs must introduce entirely different proof, including whether the computer was protected, whether it was accessed without proper authorization, and whether this access enabled defendants to defraud or obtain anything of value from plaintiffs.[5] The claims are not even temporally connected; by plaintiffs' own admissions, Mayor Thomas learned one month before the February 26, 2016, incident about the allegedly noncompliant CDBG and HOME loans. There is simply no factual overlap between the federal and state law claims.

Plaintiffs' negligence claim against Kelly, however, has the necessary factual overlap sufficient for this Court to exercise supplemental jurisdiction. Plaintiffs allege Kelly was negligent in "failing to investigate and recover documents and materials removed from the URA

---

[5] The Court rejects plaintiffs' argument that the computer fraud Martinez, Wallace, and Griffith allegedly committed under the CFAA somehow makes the underlying loans part of the factual nexus here. Courts have interpreted "defraud" under the CFAA as meaning "wronging one in his property rights by dishonest methods or schemes." NCMIC Fin. Corp. v. Artino, 638 F. Supp. 2d 1042, 1062 (S.D. Iowa 2009); Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000). Plaintiffs' allegation of access with intent to defraud merely means that defendants not only accessed a protected computer but attempted to take valuable data. United States v. Czubinski, 106 F.3d 1069, 1078–79 (1st Cir. 1997). The alleged fraud under the CFAA does not refer to the allegedly negligent loan administration.

office in the late evening hours on February 26, 2016." (Am. Compl. ¶ 339). Kelly makes no argument that plaintiffs have failed to state a negligence claim against him.

Therefore, the Court lacks supplemental jurisdiction over plaintiffs' state law claims except for the negligence claim against Kelly. Accordingly, plaintiffs' state law claims against all defendants but Kelly are dismissed without prejudice. Plaintiffs' negligence claim against Kelly may proceed.

V.  Motion for Sanctions

In a separate motion, Kelly moves for sanctions to be imposed against plaintiffs, plaintiffs' counsel Frank A. Acocella, Esq., and the law firm, the Acocella Law Group, P.C., because the allegations in the amended complaint "lack any basis in law or fact," are frivolous, and are designed to impose economic harm. (Doc. #107 at 1–3).

In plaintiffs' opposition to Kelly's motion, plaintiffs separately ask that Kelly's motion be declared frivolous, and that they be awarded fees and costs. (Doc. #118 at 18).

Rule 11 permits sanctions if a party makes a motion unjustified by facts or law or a motion that seeks to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b), (c). Courts have broad discretion in determining whether to impose sanctions. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 407 (1990). "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." United States v. Int'l Bhd. Of Teamsters, 948 F.2d 1338, 1344 (2d Cir. 1991) (citing Bus. Guides, Inc. v. Chromatic Commc'ns, 498 U.S. 533, 549–50 (1991)).

Some of plaintiffs' claims have survived the motions to dismiss, including the negligence claim against Kelly. At this early stage of the case, the Court will err on the side of finding that

16

plaintiffs' arguments were not objectively unreasonable. At the same time, however, the Court does not believe that Kelly's motion was frivolous. Accordingly, the Court will not award sanctions to either party in this matter.

## CONCLUSION

The City defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

The Titus defendants' motion to dismiss is GRANTED.

The Atlantic defendants' motion to dismiss is GRANTED.

Martinez's motion to dismiss is GRANTED IN PART and DENIED IN PART.

Kelly's motion to dismiss is GRANTED IN PART and DENIED IN PART; and Kelly's motion for sanctions is DENIED.

Plaintiffs' only surviving claims are: (i) a CFAA claim against Martinez, Wallace, and Griffith, and (ii) a negligence claim against Kelly.

The remaining defendants—Martinez, Wallace, Griffith, and Kelly[6]—must file their answers by April 9, 2019.

---

[6] As the Court has disregarded Kelly's August 6, 2018, answer to the amended complaint, Kelly is instructed to file a new answer to the remaining negligence claim against him in the amended complaint.

The Clerk is instructed to (i) terminate the motions (Docs. ##54, 57, 60, 61, 80, 84, 107, 108, 115), and (ii) terminate defendants Ernest D. Davis, Maureen Walker, Atlantic Development Group, LLC; Peter Fine; Blue Rio, LLC (a New York Corporation); Blue Rio Kenwood, LLC; Blue Rio, LLC (a Connecticut Corporation); Titus Mount Vernon, LLC; and John Saraceno.

Dated: March 26, 2019
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge